**COBBLE HILL ASSOCIATION, Brooklyn Heights Association, Carroll Gardens Association, Kane Street Block Association, South Brooklyn Citizens Committee and the Long Island College Hospital, Plaintiffs,**

v.

**Brock ADAMS, Individually and as Secretary, United States Department of Transportation, Robert Kirby, Regional Director, Region 1, United States Department of Transportation, William C. Hennessey, Commissioner, New York State Department of Transportation, Anthony R. Ameruso, P. E., Commissioner, New York City Department of Transportation, Defendants.**

No. 79 C 643.

United States District Court, E. D. New York.

May 9, 1979.

Bondy & Schloss, New York City, for plaintiffs by Jeffrey L. Glatzer, Mark A. Harmon, New York City.

Edward R. Korman, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., for federal defendants by Marilyn Go, Asst. U. S. Atty., Richard Thomas, Regional Counsel, Federal Highway Administration, Albany, of counsel.

Robert Abrams, Atty. Gen., State of N. Y., New York City, for state defendants by Eileen F. Shapiro, Ellen Marks, Asst. Attys. Gen., New York City.

Allen G. Schwartz, Corp. Counsel, City of New York, New York City, for city defendant by Joseph F. Bruno, John C. Brennan, Susan Rosenberg, Asst. Corp. Counsel, New York City.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

■ This is an action brought to enjoin defendants from implementing plans for a federally-funded highway project pending compliance with purported obligations arising under federal law. On March 12, 1979, the court denied plaintiffs' application for a temporary restraining order and set the matter down for a hearing on their motion for a preliminary injunction on April 4, 1979. During argument on this date, the court indicated its willingness to entertain defendants' proposed motion for summary judgment, and after supplemental briefing and submission of additional documentation by the parties, this motion is now before the court for decision. Bearing in mind that summary judgment may be rendered only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," Rule 56, F.R.Civ.P., and that all permissible inferences must be drawn in favor of the party opposing the motion, *Hill v. A–T–O, Inc.,* 535 F.2d 1349, 1354 (2 Cir. 1976), we proceed to a review of the facts and the applicable law.

At stake in this action is defendants' plan to repair and renovate a segment of the sadly deteriorated Brooklyn Queens Expressway (the "BQE") running from the vicinity of Atlantic Avenue to Rapelye Street near the Gowanus Expressway at a cost of approximately $6,700,000, ninety percent of which will be borne by the federal government.[1] Contractors are now on the site preparing it for the renovation, which all parties concede is necessary if the BQE is to remain functional. In response to community demands, government officials have decided to close only three lanes during the repairs, leaving two to serve northbound automobile and truck traffic and one to serve southbound truck traffic

---

1. Defendants claim the original estimate for the project was approximately three million dollars but that modifications of the plans to accommodate community demands have almost tripled that estimate (Testimony of George Zaimes, Principal Civil Engineer, New York State Department of Transportation, Hearing March 12, 1979).

> The Project report describes the BQE as: "essentially an east-west route traversing a portion of the borough of Queens and Brooklyn. This facility, designated as Interstate 278, is a major artery of significant importance because it is the only controlled-access expressway to connect the two boroughs and because it provides an expressway link for Suffolk, Nassau, Queens and northwestern Kings Counties with the Williamsburg, Manhattan, Brooklyn, Verrazzano Bridges and the Brooklyn Battery Tunnel. This linkage is possible because the easterly end of the expressway connects with the Grand Central Parkway in Queens, while the westerly terminus joins with the Gowanus Expressway and the Brooklyn Battery Tunnel. In between, the Brooklyn-Queens Expressway has a major interchange with the Long Island Expressway in Queens and connections with all bridges that link Brooklyn with Manhattan, namely, the Williamsburg, the Manhattan and the Brooklyn Bridges."

> The project area is located in that part of the BQE that forms a trench below Hicks Street cutting along the western boundary of Cobble Hill and the neighborhood known as Carroll Gardens.

only. Detoured southbound automobiles will be carried on service roads adjacent to the highway, primarily on Hicks Street West, near the nationally designated historic districts of Cobble Hill and Brooklyn Heights.

Plaintiffs—not-for-profit corporations representing, and whose members are, residents, business persons and homeowners in neighborhoods surrounding the work site, and the Long Island College Hospital, whose standing to maintain this action is not challenged—contend that State, local and federal officials have not complied with obligations imposed upon them by various provisions of federal law in proposing, approving, financing and now attempting to proceed with the BQE reconstruction project (hereafter the "project"). Specifically, they assert that defendants' failure to consider adequately the effects the project will have on the environment and the historic districts and to consider "alternatives" to the project violates procedural requirements of the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"); the National Historic Preservation Act, 16 U.S.C. §§ 470 *et seq.* ("NHPA"); the Department of Transportation Act, 49 U.S.C. §§ 1651 *et seq.* ("DOTA"); and the Federal Highways Act, 23 U.S.C. §§ 101 *et seq.* ("Highways Act"), and entitles them to injunctive relief at least pending compliance with such obligations.

While this action has been fashioned an "environmental litigation," it is important to keep certain basic notions in mind. First, the defendants contemplate only the repair, albeit costly, of the existing roadway and do not envision extensions, additions or changes in the highway. Second, the repairs will result in only temporary changes in traffic flow and patterns, although for a lengthy period of over a year. Finally, the only conceivable environmentally undesirable consequences of the proposed work are additional pollution—noise and emission—and possible vibration, which might result from the detoured automobile traffic travelling on service roads during the period of renovation. Unlike plaintiffs who typically invoke environmental laws to en-

join federal action permanently, see e. *g., County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368 (2 Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978), plaintiffs here object basically to temporary detour plans they contend will adversely affect their communities. Moreover, unlike projects normally reviewed under the NEPA or NHPA framework, see e. g., *Conservation Society of South Vermont, Inc. v. Secretary of Transportation,* 508 F.2d 927 (2 Cir. 1974), this project consists of repairs entirely within the existing right-of-way.

Although plaintiffs would plainly prefer that the responsible officials abandon their plan to repair the existing roadway in favor of construction of a new highway which would not cut through the community as does the BQE, this proposal has not met with success despite plaintiffs' considerable efforts in the political arena. Thus, while the current route of the BQE rouses the emotions of many in the communities through which it slices, the court's role here is to decide whether the facts warrant moving the defendant officials to further action and not whether they warrant moving the BQE.

According to the affidavit of Victor E. Taylor, Division Administrator for the New York Division of the Federal Highway Administration ("FHWA") of the United States Department of Transportation ("USDOT"), USDOT became aware of the necessity for the project when the New York State Department of Transportation ("NYSDOT") submitted a request to the FHWA for federal funds (Taylor Affidavit ¶ 4). The scope of the "problems" in the area was outlined in a report attached to the request. It noted that the vitrified clay pipe drainage system had apparently failed in several places, allowing silt and sand to enter the drainage lines and to be piped from beneath the pavement and collected at a pump station.

"New York City claims to be removing two tons of sand per week from the pumping station. Finally, the pavement

settled to fill the voids and the City has resurfaced the area many times. . . The pavement has been forced into irregular positions and has even caused trucks to rebound enough to strike the Kane Street overpass. If the present situation is allowed the remain, the complete loss of the pavement is anticipated.

"The retaining walls in the area are founded on sand and appear stable. However, should the drainage system continue pumping silt and sand, the walls could be undermined." (Administrative Record 1) (Hereafter "A.R.")

After approval from the Regional and Washington offices of the FHWA (A.R. 5, 6, and 7), the New York Division Administrator of the FHWA notified NYSDOT in February 1976 that the FHWA would approve funds for the proposed project with the caution that the "project should include all possible safety considerations in the completed section and for handling traffic during construction" (A.R. 7). On June 17, 1977, NYSDOT submitted a request for design approval supported by a design report, which concluded that conditions on the roadway necessitated immediate repair. It also stated the following:

"We have made the following procedural determinations:

"1. In accordance with 7–7–2 of the F.H.P.M. this project is classified as a non-major action.

"2. This project is not in conflict with the New York City Air Quality Implementation Program.

"3. A–95 clearing house review is not required.

"4. A public hearing is not required since the project will not:

"a. Require acquisition of right-of-way.

"b. Have an adverse effect upon abutting real property.

"c. Change the layout or function of connecting roads or streets." (A.R. 10.)

The attached report also detailed "Social Economic and Environmental Considerations:"

"Stated previously in this report, was the fact that a partial removal of traffic from the expressway would be necessary to perform the work. Through a stage type construction procedure, only the westbound expressway traffic will be removed completely. This will be accomplished by closing, temporarily, the existing westbound expressway entrance from Columbia Street, constructing a temporary westbound expressway ramp between Atlantic Ave. and Congress St., meeting Hicks Street West (the paralleling service road) at Congress Street and converting the existing Rapelye Street exit at Hicks Street West to a westbound expressway entrance. Minor traffic which wishes to enter the eastbound expressway from Hamilton Avenue will be diverted to Hicks Street East and enter at Atlantic Avenue.

"Recognizing the necessity for this diversion of traffic, the planned sequence will have the least effect on the surrounding community.

"2. As outlined in Volume 7, Chapter 7, Section 2 of the FHPM, this project is considered a 'non-major' action, and does not require an environmental impact or negative declaration. . . ." (A.R. 10 at 15.)[2]

Notice of the request for design approval was published in the New York Times and the New York Daily News (A.R. 13). On July 29, 1977, the FHWA granted design approval and concurred in the NYSDOT determinations (A.R. 14). A notice of design approval was published in the New York Times and the Daily News (A.R. 17).

In November 1977, the FHWA became aware of community concerns over the impact of the project (Taylor Aff. ¶ 25), which were detailed in a letter to Congressman Fred Richmond from the Cobble Hill Association (A.R. 18). The letter acknowledged

2. The diversion plan outlined in the report was apparently modified in response to community concerns and requests. See Zaimes Aff. ' 8.

the necessity of the project but expressed concern over the stability of the buildings on Hicks Street—through which traffic is to be rerouted—and the additional inconvenience, noise and pollution the community would experience. By letter dated November 22, 1977, the FHWA informed the Association of the detour plan, the results of a noise study (A.R. 20), and notified it that NYSDOT would conduct studies on the structural stability of the buildings on Hicks Street.[3]

In February 1978, an official of the US-DOT Office of Environment called the FHWA about the Association. This call evidently prompted the FHWA to seek a determination of "effect" on the neighboring historic districts from the State Historic Preservation Office ("SHPO"), which it had not sought until that time. On March 14, 1978, the USDOT Office of Environment and Safety informed the Association that the responsible agencies had "correctly and adequately addressed environmental concerns" (A.R. 30). On March 16, 1978, the SHPO issued to NYSDOT a determination that the project would not have an effect on the district (A.R. 32), and the FHWA gave final approval for the project and authorized NYSDOT to advertise for bids on September 19, 1978 (A.R. 40).

In January 1979, the defendants entered into a construction contract with the Edward Fitzpatrick Jr. Construction Company, pursuant to which the contractor has begun preliminary work on the roadway. Plaintiffs commenced this suit when they were unable to convince the defendants to change their plans and to give further consideration to alternatives and to the effects of the current project.

Plaintiffs claim primarily that they are entitled to injunctive relief because of the alleged violations of both NEPA and NHPA. They assert first that the administrative record contains proof that the defendants did not comply with NHPA and, in fact, made their determination in bad faith.

They also contend that the administrative record is incomplete and inadequate to support defendants' action in violation of NEPA in that (1) it fails to consider the environmental effects of closing the Rapelye Street exit to the BQE; (2) the defendants have unlawfully segmented the project from what plaintiffs describe as "Phase II"; and (3) defendants have proceeded with the project before adequately determining the effects upon abutting real property and the surrounding environment and therefore have acted in an arbitrary and capricious manner. Before turning to the merits of plaintiffs' arguments, we must determine the scope of our review.

### Standard of Review

The court's role is a limited one. Under principles set forth in the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*, judicial review of administrative determinations is limited to deciding whether the agency action under scrutiny was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). See *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Hanly v. Kleindienst*, 471 F.2d 823, 829–30 (2 Cir. 1972), *cert. denied*, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974 (1973) ("*Hanly II*"). In cases challenging a determination that no impact statement is required under NEPA or of no effect under NHPA, review is based solely upon the administrative record—which the agency has an affirmative obligation to develop, see *Harlem Valley Transportation Ass'n v. Stafford*, 500 F.2d 328, 337 (2 Cir. 1974); *Hanly. II, supra* at 836; *Hanly v. Mitchell*, 460 F.2d 640, 647 (2 Cir.), *cert. denied sub nom. Hanly v. Kleindienst*, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256 (1972) ("*Hanly I*")—unless the plaintiff raises "issues sufficiently important to permit the introduction of new evidence in the district court," such as a complete failure "to mention a serious environmental consequence

---

**3.** Such studies have been undertaken and resulted in a decision to monitor the vibrations and to continue to test for structural problems.

Defendants are committed to authorizing detours only upon completion of current inspections (Zaimes Aff. ¶¶ 7, 8).

. . . [or] to discuss some reasonable alternative . . .", *County of Suffolk v. Secretary of Interior, supra,* 562 F.2d at 1384–85.[4]

■■■ The standard of review is primarily one of rationality of government decision making. *Cross-Sound Ferry Services, Inc. v. United States,* 573 F.2d 725, 729 (2 Cir. 1978). See also *Harlem Valley Transportation Ass'n v. Stafford, supra,* 500 F.2d at 337. As stated by the Second Circuit in *Cross-Sound Ferry Services, Inc. v. United States, supra,* 573 F.2d at 729:

"Once it has been determined that decisions are supported by substantial evidence,

"[a] reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . . Although this inquiry into facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.' *Citizens to Preserve Overton Park v. Volpe,* [*supra,* 401 U.S.] [402] at 416 [91 S.Ct. [814] at 824 [, 28 L.Ed.2d 136]]. . . [W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595 [, 65 S.Ct. 829, 89 L.Ed. 1206] (1945). [Quoting from *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 442 [, 42 L.Ed.2d 447] (1974)]."

Thus, where governmental action is reasonably related to permissible objectives, it is generally accorded great deference and review of the action is necessarily circumscribed.

Despite ample opportunity to persuade the court—through testimony at the previous hearings and submission of additional documentation—that a genuine issue as to material fact exists for trial, plaintiffs have failed to do so although the conclusions to be drawn from the facts are very much in controversy. After carefully reviewing the record, the court concludes that no genuine issue of fact remains to be litigated and that defendants have demonstrated their entitlement to judgment as a matter of law.

### Plaintiffs' Claims Under NEPA

Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), provides:

"The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

\* \* \* \* \* \*

"(C) include in every recommendation or report on proposals for legislation and other major Federal action significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

**4.** Defendants contend that the date by which compliance with NEPA should be measured is September 19, 1978, the date on which the FHWA gave NYSDOT approval for the project (A.R. 40). At that time, the federal government incurred a contractual obligation with the State and thereby irreversibly committed federal funds. See *Conservation Society of South Vermont, Inc. v. Secretary of Transportation,* 531 F.2d 637, 640 (2 Cir. 1976). This contention is not seriously disputed with respect to the project under review.

The administrative decision here under attack is defendants' conclusion that the project is not major federal action and that therefore no "impact statement" is required. In this circuit, a distinction is drawn in certain circumstances between what constitutes major federal action and whether that action significantly affects the human environment. *Hanly I, supra,* 460 F.2d at 644. *Cf. Monroe County Conservation Council, Inc. v. Volpe,* 472 F.2d 693 (2 Cir. 1972). Thus, the *Hanly I* court determined that the defendant officials, after conceding that the project at issue was a major federal action, had an obligation to support their conclusion that the project would not significantly affect the environment so that an impact statement was not required. It is not absolutely clear, however, whether administrative officials, after determining that a project is non-major under applicable guidelines, must also determine that the project will not significantly affect the environment or whether the inquiry ends following such a conclusion. Compare *City of Davis v. Coleman,* 521 F.2d 661, 673 n.15 (9 Cir. 1975); *Public Interest Research Group v. Butz,* 498 F.2d 1314, 1321–22 (8 Cir. 1974); *Mont Vernon Preservation Society v. Clements,* 415 F.Supp. 141, 146–47 (D.N.H.1976), with *Julis v. City of Cedar Rapids, Iowa,* 349 F.Supp. 88 (N.D. Iowa 1972).

Although an interpretation of NEPA requiring both a finding of major federal action *and* significant effect on the environment before obligations under the statute arise would appear to contain a presumption—perhaps rebuttable—that there can be no significant effect on the environment in non-major federal action, we need not reach this question since the defendant officials apparently did consider environmental effects and did make a determination of no effect, which can also be reviewed under the standards set forth above.

5. The Council on Environmental Quality Guidelines, which are advisory but "carry significant weight," *Natural Resources Defense Council v. Callaway,* 524 F.2d 79, 86 n.8 (2 Cir. 1975), state that:

"The identification of major actions significantly affecting the environment is the re-

The FHWA regulations implementing NEPA are found at 23 C.F.R. § 771 *et seq.*[5] They provide the standards by which a federal-aid highway project is classified as major or non-major for purposes of NEPA. See 23 C.F.R. § 771.9(d). In relevant part, the regulations state that:

"(d) Major actions are those of superior, large and considerable importance involving substantial planning, time, resources or expenditures. Any action that is likely to precipitate alterations in land use; planned growth development patterns; traffic volumes; travel patterns; transportation services, including public transportation; and natural and manmade resources would be considered a major action. The following are examples of types of actions which are ordinarily considered to be major actions:

"(1) A new freeway or expressway.

"(2) A highway which provides new access to an area and is likely to precipitate significant changes in land use or development patterns.

"(3) A new or reconstructed arterial highway which provides substantially improved access to an area and is likely to precipitate significant changes in land use or development patterns.

\* \* \* \* \* \*

"(6) Added interchanges to a completed freeway or expressway which provides new or substantially improved access to an area and are likely to precipitate significant changes in land use and development patterns.

"(7) A project that warrants a 'major action' classification because it has been given national recognition by Congress even though it is not included in the above list. Such a project would be one that falls under section 4(f) of the

sponsibility of each federal agency, to be carried out against the background of its own particular operations. . . . The words 'major' and 'significantly' are intended to imply thresholds of importance and impact that must be met before a statement is required." 40 C.F.R. § 1500.6(c).

DOT Act or section 106 of the National Historic Preservation Act.

"(e) The following are examples of types of actions which are ordinarily considered to be non-major actions:

\* \* \* \* \* \*

"(2) Modernization of an existing highway by resurfacing, widening less than a single lane width, adding shoulders, adding auxiliary lanes for localized purposes (weaving, climbing, speed changes, etc.), and correcting substandard curves and intersections.

\* \* \* \* \* \*

"(4) Safety projects such as grooving, glare screen, safety barriers, energy attenuators, etc."

■ Upon application of these regulations, defendants determined that the project was not major. Plaintiffs argue that proper application of the regulations to the facts of the case warrants a contrary finding. They assert that the project is not an ordinary repair since it has required substantial planning and will entail a lengthy period of reconstruction as well as substantial expenditures.

The project, however, only involves the repair of an *existing* highway. It does not contemplate a widening of an artery or other significant changes that would result in permanent dislocations of traffic or changes in the area's development. See *Julis v. Cedar Rapids, Iowa, supra,* in which the court upheld an agency decision that a project enlarging a city traffic artery from two to four lanes for fourteen blocks was not major and that an impact statement was thus not necessary. See also *Kisner v. Butz,* 350 F.Supp. 310 (N.D.W.Va.1972). While the repairs here are undoubtedly significant, they are not of the character to warrant a NEPA statement since they will not result in any long-term changes in the environment, alterations in land use, planned growth or other consequences contemplated by statute and regulation. Thus, under these circumstances, the court cannot conclude that the determination that the project was not major constitutes arbitrary and capricious action, is not otherwise in accordance with law, or represents an unreasonable judgment on the part of the government officials involved.

Moreover, the only environmental effects of the reconstruction, if any, will be merely incidental to the repairs: the rerouting of automobile traffic into alternate service roads may result in a temporary increase in noise and air pollution, although defendants contend this will not be the case. While a determination of no significant effect on the environment may well be unnecessary following a conclusion that a project is not major, it is apparent that the defendants did recognize the environmental consequences of their action from the inception of the project and did find no significant effect. In these circumstances, should it appear that defendants' determination of no effect satisfies the standard of review, the debate on the proper characterization of the federal action as major or not is rendered largely academic.

The *Hanly II* court established two factors which should be considered in reviewing the effects of proposed action:

"(1) the extent to which the action will cause adverse environmental effects in excess of those created by existing uses in the area affected by it, and (2) the absolute quantitative adverse environmental effects of the action itself, including the cumulative harm that results from its contribution to existing adverse conditions or uses in the affected area." 471 F.2d at 830–31.

The court went on to note that "[w]here conduct conforms to existing uses, its adverse consequences will usually be less significant than when it represents a radical change."

■ The repair of the roadway contemplates preservation of the highway and not a departure from its present use. Although the streets through which detoured traffic will be rerouted may undergo an increase in traffic, they are currently heavily used and thus should not change radically in character. Since the effects of the repair and of the consequent rerouting of traffic

during the period of reconstruction will not result in radical changes in the area and are incidental to defendants' attempts to conform the project to existing uses, the finding of no significant environmental effect cannot be considered arbitrary and capricious.[6]

This conclusion is in keeping with the standards applied in this circuit. In *Sierra Club v. Adams,* 586 F.2d 832 (2 Cir. 1978), the court affirmed a district court order denying injunctive relief in circumstances not dissimilar to those presented here. Applying the *Hanly II* standards quoted above, the court determined that no impact statement was required for a project to repair and partially reconstruct a ten-mile stretch of highway. Traffic lanes and shoulders were to be resurfaced and slightly widened; climbing lanes were to be provided in certain sections; drainage was to be improved and a dangerous condition near the highway was to be eliminated. Since the project was to "conform" to existing uses, the adverse consequences were likely to be less significant. In the circumstances, the court held that the appellant had not met its burden of showing that there was an abuse of discretion in the denial of preliminary relief.

Plaintiffs argue nonetheless that the defendants have not fully considered the environmental impact of the project and, in fact, have acted in bad faith in classifying the project as non-major federal action. They base this argument upon what they perceive as defendants' efforts to "segment" this project from other portions of a larger plan or scheme to alter radically the highway system in the area and thereby avoid obligations to which they would otherwise be bound. They rely primarily upon documents pertaining to what they see as the permanent closing of the Rapelye Street exit of the BQE, which if included with the present repairs arguably would change the project into major action for purposes of NEPA.

A contemplated addition of a connection at the interchange between the BQE and the Gowanus Expressway, which plaintiffs call "Phase Two," is purportedly linked to the project by action taken with respect to the Rapelye Street exit. Plaintiffs assert that NYSDOT documents reveal a scheme by which the exit will be "temporarily" closed during the project, will not be reopened thereafter or if reopened only for a short period before permanent closing. Thus, they assert the project is in reality a segment of a larger scheme to which NEPA obligations most assuredly attach.

While there can be little doubt that the permanent closing of the Rapelye Street exit has been contemplated by the responsible officials for some time, its relationship to the project is less evident than plaintiffs contend. It need not inexorably follow from the sequence of the projects that they are impermissibly "segmented" to circumvent NEPA obligations. If the permanent closing of the exit meets the threshold for requiring a NEPA statement—as plaintiffs appear to suggest—defendants' failure to provide such a statement would be a fair ground for litigation at that time. The possibility of permanent closing of the Rapelye Street exit at some unspecified future date does not, however, warrant imposition of NEPA obligations in the present circumstances.

As stated above, the current project is essentially a necessary repair of an existing roadway in which no radical changes are proposed and, as such, must be considered independently. Where the governmental action under scrutiny is clearly not subject to NEPA obligations, it does not become so merely by its proximity in time and space to action which might be major. Every repair of a manhole arguably is a small piece of a larger scheme of reconstruction, which if viewed as a whole might meet the threshold for major federal action. Yet Congress decided that some action, characterized as not major, should not war-

---

**6.** Contrary to plaintiffs' assertion, mere neighborhood opposition to federal action is not "controversy" such as to require preparation of an impact statement. *Hanly II, supra,* 471 F.2d at 830.

rant the burdensome requirement of development of an impact statement. Under the circumstances presented, the court believes the action at issue was reasonably categorized as a non-major repair, notwithstanding its "relationship" to the Rapelye Street exit and "Phase Two" and thus is exempt from NEPA statement requirements. See *Conservation Society of South Vermont v. Secretary of Transportation,* 531 F.2d 637, 639–40 (2 Cir. 1976). See also *Kleppe v. Sierra Club,* 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976).

Plaintiffs' further argument that defendants' action was arbitrary and capricious because defendants failed to consider the adverse effects upon the abutting real property is misdirected to the extent it is predicated on NEPA. Plaintiffs argue that the detour and diversion of traffic into their neighborhoods will have adverse consequences upon the real property. As evidence of such potential adverse effects, plaintiffs refer to a study currently in progress by a consulting firm, which will not be completed for several weeks. The study is cited not only for the proposition that there are apparently potential adverse consequences which greatly concern defendants but also for the theory that the officials in this case acted before they considered the potential impacts.

■ We doubt that Congress intended that effects upon the structural stability of buildings in an area adjacent to a proposed federal highway repair project are among those protected against by federal environmental laws. Effects of the nature suggested here are simply not those associated with environmental consequences, and it is clear that the responsible officials properly did not view them as such. While extensive studies were made with respect to noise and air pollution, the concern over the structural stability of the buildings in the area arose sometime after the Cobble Hill Association began its campaign of letter writing and the responsible officials became aware of the communities' concern for the stability of the buildings on Hicks Street and of

possible responsibilities under the NHPA. In an effort to assure compliance with all applicable regulations and constraints on federal action and to exercise commendable caution with respect to property, the officials endeavored to determine the effects upon the historic districts and upon buildings along the detour route. These actions hardly support the proposition that effects on the structural stability of buildings, if any, warrant consideration under NEPA although a different conclusion might obtain under the NHPA. If the result were otherwise, every isolated blast of dynamite at a construction site would assuredly require imposition of independent NEPA obligations. It is implausible that NEPA was intended to apply in such circumstances.

■ Plaintiffs' final argument—that defendants did not adequately consider alternatives to their action—is without merit. Having decided to repair the existing highway in accordance with applicable law— which we consider an unassailable judgment given the condition of the BQE and defendants' reasonable desire to keep it functional—defendants were under no obligation to consider alternatives to *repair* such as the construction of a new highway. Thus, whether or not plaintiffs eventually succeed in undoing what they perceive as the harm caused to their community by the present route of the highway, repair to the BQE is necessary in the interim. While we are aware that commitment of scarce resources to a repair might decrease the possibility of an alternate route, the proper forum for these contentions is the political arena, not the court.

■ Thus, the only "alternatives" which defendants were obliged to consider, assuming any NEPA obligations attached, were alternative traffic detour and dispersion plans to mitigate the effects of a possible increase in local traffic. The final plans, however, appear to be the result of community pressure and demands. It cannot be said that defendants failed to consider al-

ternatives when, in fact, plaintiffs were partly responsible for the final plans.[7]

### Claims Under NHPA

NHPA provides that:

"The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under sections 470i to 470n of this title a reasonable opportunity to comment with regard to such undertaking." 16 U.S.C. § 470f.

Under the regulations implementing NHPA, agency obligations under the statute are independent from NEPA and must be complied with even when NEPA obligations do not arise. 36 C.F.R. § 800.2. Thus, for each federal undertaking, the responsible agency must take certain steps. First, it must identify properties included or eligible for inclusion in the National Register within the area of the undertaking's potential environmental impact. 36 C.F.R. § 800.4(a). It must then make a determination of effect in consultation with the State Historic Preservation Officer, applying criteria set forth in § 800.8. The undertaking may proceed if there is a finding of no effect. A record of the determination of no effect must be kept. 36 C.F.R. § 800.4(b).

Apparently upon being informed that NHPA obligations might possibly exist, the defendants—in what the court believes was an excess of caution—attempted to comply with the statute's requirements. In a handwritten memorandum dated February 22, 1978, an employee of USDOT wrote that "on February 22, 1978 Mr. Greco [sic][8] OST called regarding the Cobble Hill Association.

"Mr. Greco wanted to know if a determination of effect had been or would be requested from the SHPO.

"He was informed that at present no such request has been made or is planned.

"Mr. Greco did not state so, but his conversation was such to indicate that he felt a request should be made.

"He ended his call informing us that he would be in contact at a later date.

"The present status of the Project is that contract plans are being developed. Advance detail plans have been reviewed. The project has a spring 1978 PS&E schedule. Instructing the State to request an effect determination if delayed would require postponing letting. Should a determination of effect be made by the SHPO this would iniate [sic] a major action requiring recycling the Project.

---

7. We also believe that defendants sufficiently afforded interested parties an opportunity to present their views. In *Hanly, II, supra*, which involved major federal action, the court established a flexible approach to affording the public an opportunity to submit facts to the agency's attention. The court noted that:

"The necessity for a hearing will depend greatly upon the circumstances surrounding the particular proposed action and upon the likelihood that a hearing will be more effective than other methods in developing relevant information and an understanding of the proposed action. The precise procedural steps to be adopted are better left to the agency, which should be in a better position than the court to determine whether solution of the problems faced with respect to a specific major federal action can better be achieved through a hearing or by informal acceptance of relevant data." 471 F.2d at 836.

Under the facts presented, the notice provided to the public and the numerous informal contacts, by letter and discussion with the responsible officials, satisfied the requirement that an opportunity to present facts be afforded. *Cf. Save the Courthouse Committee v. Lynn*, 408 F.Supp. 1323 (S.D.N.Y.1975).

8. Robert Crecco, Environmental Affairs Specialist, Office of the Secretary of Transportation, United States Department of Transportation.

"A twelve month delay would result, if a determination of effect is given as this would become a major action. I recommend that we tell the State to begin 106 procedures in regard to the Cobble Hill historic district. Without a determination we are open to any Court suit. With a determination by the SHPO of no effect the case would be closed and the Project would be clear to progress. The involvement of this Project upon the historic district is limited to indirect (noise, air, traffic detours) impacts and a determination of no effect would be reasonable." (A.R. 28.)

On March 10, 1978, a NYSDOT official wrote to the SHPO requesting a determination of no effect (A.R. 29). The letter summarized the proposed repairs and stated that provisions had been made to assure that traffic dislocations would have the least effect on the surrounding communities possible. The letter noted NYSDOT's conclusion, concurred in by the federal authorities, that there would be no effect on the environment as a result of the project.

On the basis of this letter, the SHPO provided a determination of no effect by letter dated March 16, 1978, which stated in relevant part that:

"The State Historic Preservation Officer has reviewed the project referenced above. It is our understanding, based upon the description of work provided in your letter, that the project is proposed to correct various deficiencies in the roadway itself, and will involve no construction activities outside the existing right-of-way. The rerouting of traffic, while perhaps an inconvenience to residents of the area, is temporary and will cause no physical damage to structures in the historic district.

"Consequently, it is the opinion that this project will have no effect on the Cobble Hill Historic District." (A.R. 32.)

Plaintiffs initially argued that defendants had a duty under the statute to undertake a study of the possible effects of an undertaking upon the historic district and that the SHPO did not conduct such a study, but relied solely upon information provided by NYSDOT. They further argue that because NYSDOT was not concerned at the time with the effects of detoured traffic and diversion plans upon the district, it could not have supplied SHPO with information upon which it could adequately review such possible effects on the historic districts. They now claim that USDOT acted in bad faith and impermissibly delegated the entire responsibility for obtaining a determination from SHPO to NYSDOT.

 Notwithstanding the possible accuracy of some of these observations,[9] plaintiffs' arguments do not entitle them to injunctive relief in the circumstances presented. In enacting the NHPA, Congress declared that "the historical and cultural foundations of the Nation should be preserved as a living part of our community life and development in order to give a sense of orientation to the American people . . . ." 16 U.S.C. § 470(b). This declaration of policy and the legislative history underlying the act make clear that the fundamental purpose of the act and regulations implementing it is to protect our historical heritage from extinction but not necessarily from every conceivable threat resulting from the exigencies of modern life. NHPA was not enacted to review temporary effects resulting from maintenance efforts and repair programs. Rather, it deals with such effects as "may cause any change, beneficial or adverse, in the quality of the historical, architectural, archeological, or

---

9. A complete abdication of responsibilities under NHPA has been held sufficient in certain circumstances to entitle plaintiffs to injunctive relief pending compliance. See *Hall Cty. Historical Society v. Ga. Dept. of Trans.*, 447 F.Supp. 741 (N.D.Ga.1978). Not every deviation from proper procedures, however, justifies such relief. See *D. C. Federation of Civic Asso-* *ciations v. Adams*, 571 F.2d 1310, 1313 (4 Cir. 1978). Were it necessary to our decision, the court would find that under the facts presented, the record sufficiently supports defendants' determination of no effect under NHPA despite various questions raised regarding defendants' procedure in obtaining the determination.

cultural character that qualifies the property under the National Register criteria." 36 C.F.R. § 800.8. In most cases then, NHPA is intended to forestall the wrecking ball until responsibilities under the statute are fulfilled. See, e. g., *Edwards v. First National Bank*, 534 F.2d 1242 (7 Cir. 1976); *Save the Courthouse Committee v. Lynn*, 408 F.Supp. 1323 (S.D.N.Y.1975); *Aluli v. Brown*, 437 F.Supp. 602 (D.Hawaii 1977); *Inman Park Restoration, Inc. v. Urban Mass Trans. Administration*, 414 F.Supp. 99 (N.D.Ga.1976).

■ The threat which plaintiffs perceive to the historic districts is indirect at best. The project at issue is not located in the districts. The detour routes and dispersion plans, moreover, do not direct traffic into the districts. Rather, the plans scrupulously avoid such effects upon the districts by carefully sending traffic around the neighborhoods.[10] In these circumstances, plaintiffs' arguments of indirect and secondary effects are not particularly weighty. Simply put, there is nothing in the record that remotely suggests harm to the historical or architectural character of the community warranting intervention on NHPA grounds. Plaintiffs have merely demonstrated that there may be additional noise and air pollution in the area—which has been thoroughly considered by defendants—as well as possible vibration due to the traffic in the area.

The defendant officials, however, have already undertaken various seismological tests concerning the stability of the buildings in the area and have determined that the safest course is to maintain a permanent observation of the condition of the buildings during the period of the repairs. They are, in addition, currently conducting yet further studies to identify unsound buildings near the area presumably so that they may be supported or protected against damage.

In view of the inquiries and studies made by the agency in compliance with their obligations under NEPA, it cannot be said that the administrative record does not support the finding of no effect upon the district under NHPA, notwithstanding defendants' course in obtaining the ultimate determination. The purpose of the act has been served in the circumstances under review, and this court could reasonably be accused of exalting form over substance—and causing additional and unwarranted expense to the detriment of all concerned— were it to prevent defendants from proceeding and to require them to justify further on NHPA grounds action to which NHPA obligations do not fairly attach.

We have reviewed plaintiffs' other contentions and find them without merit. Accordingly, defendants' motion for summary judgment dismissing the complaint is granted.

SO ORDERED.

---

10. These plans, in fact, were developed in response to the communities' fears and in close cooperation with a community task force formed to monitor and advise the defendant officials.