WISCONSIN HERITAGES, INC., a
Wisconsin Corporation, Plaintiff,

v.

Patricia HARRIS, Secretary, United
States Department of Housing and
Urban Development,

Ronald Gatton, Regional Director Region
5, United States Department of Hous-
ing and Urban Development,

John Kane, Milwaukee Area Director,
United States Department of Housing
and Urban Development, Redevelop-
ment Authority of the City of Milwau-
kee, and Marquette University, Defend-
ants.

No. 78–C–632.

United States District Court,
E. D. Wisconsin.

June 5, 1980.

Daniel J. Steininger, Ebert & Ebert, and William H. Lynch, Milwaukee, Wis., for plaintiff.

Joan F. Kessler, U. S. Atty., Milwaukee, Wis., for defendants Harris, Gatton and Kane.

Janet Geronime, Arnold P. Anderson, Ray J. Aiken, Milwaukee, Wis., for Marquette University.

Michael A. I. Whitcomb, James E. Fitzgerald, Asst. City Attys., Milwaukee, Wis., for Redevelopment Authority.

## DECISION AND ORDER

MYRON L. GORDON, District Judge.

This action is before me on the motion of the plaintiff for leave to file a supplemental pleading and on the motion of Marquette University for summary judgment. The plaintiff's motion will be denied, Marquette's motion will be granted, and this action will be dismissed.

### I. BACKGROUND

The plaintiff filed this action alleging that the defendants failed to comply with several federal and state environmental and historic preservation laws in connection with the contemplated demolition of the Elizabeth Plankinton mansion. The plaintiff, Wisconsin Heritages, Inc., is a nonprofit Wisconsin corporation organized, in part, to preserve buildings of architectural and historical value. The defendants include various officials of the United States Department of Housing and Urban Development (collectively referred to herein as "HUD"), the Redevelopment Authority of Milwaukee (RAM), and Marquette University. HUD is responsible for administering federal assistance to urban renewal programs; it had previously agreed to pay for the demolition of the mansion. RAM is responsible for preparing and implementing urban renewal plans for the city of Milwaukee. Marquette is the present owner of the land on which the Elizabeth Plankinton mansion is located.

The plaintiff's amended complaint, filed October 12, 1978, alleges seven causes of action. The plaintiff's first cause of action alleges that HUD failed to comply with the requirements of the National Historic Preservation Act of 1966 (NHPA), 16 U.S.C. § 470 et seq., Executive Order 11593, and regulations promulgated by the Advisory Council on Historic Preservation, 36 C.F.R. § 800.1 et seq., before approving federal financial assistance for the demolition of the building. The second through fifth causes of action allege that HUD and RAM failed to prepare an environmental impact statement with regard to the expenditure of federal funds for the mansion's demolition and otherwise failed to comply with the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. and HUD regulations implementing NEPA. The sixth and seventh causes of action allege violation of the Wisconsin Historic Preservation Program, § 44.22, Wis. Stats., and the Wisconsin Environmental Protection Act, § 1.11, Wis.Stats.

On November 17, 1978, I entered an order preliminarily enjoining the defendants HUD and RAM from authorizing or permitting the demolition of the Elizabeth Plankinton mansion. 460 F.Supp. 1120. I also affirmatively enjoined HUD to conduct an environmental review procedure and to prepare an environmental impact statement (EIS) pursuant to the provisions of 42 U.S.C. § 4332. I further ordered that RAM's motion to dismiss counts six and seven of the complaint be granted.

On February 13, 1979, HUD disseminated its draft EIS to various state and federal governmental agencies and the public. HUD requested comments regarding the draft EIS from sixteen federal agencies, six state agencies, four county agencies, six city agencies and various private parties, including the plaintiff in this case. The formal period for public comment ran until April 23, 1979. No requests for an extension of the period were received by HUD.

On June 7, 1979, HUD filed with the court its final EIS, which made the following recommendations with regard to HUD's funding of the mansion's demolition:

"It is our opinion that HUD assistance to the proposed action would result in environmental impacts which are significantly adverse and therefore considered unacceptable under HUD environmental policies and standards. Therefore, HUD se-

lects alternative 3.210 *No Federal action.* This alternative is chosen in view of the possibility of relocation.

"HUD will review this decision in six months of the date of this FEIS. It is expected that HUD will receive evidence of financial commitment to relocate the Plankinton House along with a workable relocation and continued maintenance plan.

\*   \*   \*   \*   \*   \*

"In the event conditions specified above are not received within the six month period, HUD will select revised alternative 3.230(a)(b) *Project as Proposed with Modification . . .*"

In the final EIS § 3.230, "Project as Proposed with Modification," provided:

"a. Prior to demolition, accomplish adequate documentation of the interior and exterior of the Plankinton House, in accordance with the standards of the Historic American Building Survey.

"b. Prior to demolition, remove, store and preserve such fixtures, attachments, equipment accommodations and accoutrements of the original structure as have special historical, cultural or artistic significance or value that can practically be detached, removed, stored and preserved for re-installation."

Subsequent to the court's entry of a preliminary injunction in this case, efforts were made by various parties to secure financing for the relocation of the mansion. On September 11, 1979, I entered an order modifying the terms of the previously entered injunction, setting specific dates by which the injunction would be vacated. 476 F.Supp. 300, 302. That order stated in part:

". . . that if prior to March 1, 1980, contracts are entered into between the Redevelopment Authority of Milwaukee and a qualified person or corporation which provide for the removal of the Elizabeth Plankinton mansion from its present site on or prior to August 31, 1980, the preliminary injunction pending in this case will be vacated upon the removal of the mansion from its present location.

"IT IS FURTHER ORDERED that in the event such contracts are not entered into by March 1, 1980, then the preliminary injunction presently in effect will be vacated on that date." 476 F.Supp. at 303.

The reason for the court's entry of the above order is pertinent to the motions currently at bar. At the time of the September 11, 1979, order, HUD had already filed the EIS required by the injunction in this case. With that requirement fulfilled, Marquette arguably could have sought dissolution of the injunction then in effect. *See* 460 F.Supp. at 1127. Instead, however, Marquette agreed to the extension of the injunction provided by the above order. It was based on the consent of the parties that the court entered the order. 476 F.Supp. at 301. A promise made by the plaintiff apparently induced Marquette's consent to the extension. The promise is reflected in a letter from the plaintiff's counsel to Marquette's counsel, dated July 24, 1979, which stated in part:

"The purpose of this letter is to confirm our telephone conversation of July 24, 1979. It is my understanding that the date March 1, 1980 suggested by me on behalf of Wisconsin Heritages, Inc. relates to the date by which a firm binding commitment shall have been made by a qualified person or corporation to remove and restore the Elizabeth Plankinton Mansion. It is my understanding that *should no firm commitment be made by that date the preliminary injunction would be dissolved and Wisconsin Heritages, Inc. would have no further role to play through the court in the disposition of the Elizabeth Plankinton Mansion.* This position, of course, does not bind in any way the Redevelopment Authority in determining what course it would take should no commitment be forthcoming." (emphasis added).

As of March 1, 1980, no commitment had been made providing for the removal of the mansion. Thus, under the terms of the court's order of September 11, 1979, the injunction was vacated on March 1, 1980. The plaintiff has now made a motion for

leave to file supplementary pleadings and Marquette University, with the support of the other defendants, has moved for summary judgment.

## II. MOTION FOR LEAVE TO FILE SUPPLEMENTARY PROCEEDINGS

■ In its proposed supplementary complaint, the plaintiff attacks HUD's draft and final EIS. Specifically, the plaintiff alleges that HUD failed to consider adequately the alternative of rehabilitation and reuse of the mansion on its present site by parties other than Marquette, and that HUD failed to follow the provisions of the National Historic Preservation Act, Executive Order 11593 and regulations of the Advisory Council on Historic Preservation found in 36 C.F.R. § 800 et seq.

Rule 15(d), Federal Rules of Civil Procedure, provides in pertinent part:

"Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit him to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented."

While leave to file supplemental pleadings should be liberally granted where such pleadings will help avoid piece-meal litigation, "[i]f the moving party is guilty of inexcusable delay or laches, the supplemental pleading will not be permitted." 6 Wright & Miller, Federal Practice & Procedure, § 1510. The proposed filing of the plaintiff's supplemental complaint is untimely in two senses, and thus its filing cannot be permitted.

The procedure set up under NEPA for the preparation of environmental impact statements contemplates input by interested parties and governmental agencies *during* the course of the drafting of such statements. *See* 42 U.S.C. § 4332(2)(C) and 40 C.F.R. § 1503.1. The procedure followed by HUD in this case of circulating a draft EIS among interested parties was designed to allow HUD to consider the positions of interested parties *prior* to issuing its final EIS. This procedure is designed to avoid belated criticism of the final EIS after it is issued by allowing the agency to consider the bases of such criticism before the final EIS is drafted.

In *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553–54, 98 S.Ct. 1197, 1216, 1217, 55 L.Ed.2d 460 (1978), the Supreme Court emphasized the importance of timeliness with regard to the comments of interested parties wishing to express an opinion during the preparation of environmental impact statements:

"In the first place, while it is true that NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, it is still incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions. . . . Indeed, administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have the determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'"

Over fifteen months ago, the plaintiff had in its possession a copy of HUD's draft EIS. That draft included a discussion of alternatives to demolition of the mansion. HUD asked the plaintiff at that time for comments regarding the draft EIS. A forty-five day period was designated in which the plaintiff and other interested parties could comment on the draft. At no point during that period did the plaintiff claim that HUD's draft discussion of alternative actions was insufficient nor did the plaintiff otherwise raise any of the objections which it now seeks to raise in its supplemental complaint. To allow the plaintiff to raise such objections a year after the "comment period" passed would frustrate the procedure followed in drafting environmental impact statements.

The plaintiff's proposed supplemental complaint is untimely in a second sense. In

the letter dated July 24, 1979, quoted above, the plaintiff's attorney stated to Marquette's attorney that "Wisconsin Heritages, Inc. would have no further role to play through the court in the disposition of the Elizabeth Plankinton Mansion" if a commitment to move the building was not received by March 1, 1980. Based on this representation, Marquette agreed to allow the preliminary injunction to remain in effect through March 1, 1980. To allow the plaintiff further to prolong this case by filing a supplemental complaint would be unfair to Marquette in light of the plaintiff's past representations.

Finally, for reasons I will discuss in greater length below, I do not believe that the allegations contained in the plaintiff's proposed supplemental complaint would justify any further injunctive relief in this case. Accordingly, the plaintiff's motion for leave to file a supplemental pleading will be denied.

### III. MARQUETTE'S MOTION FOR SUMMARY JUDGMENT

Of the five remaining causes of action alleged in the plaintiff's amended complaint, four allege a failure on the part of HUD and RAM to comply with NEPA's provisions and with HUD regulations promulgated under NEPA. Evaluating Marquette's motion for summary judgment with respect to these four causes of action involves two steps: (1) determining whether HUD's EIS complies with the requirements of NEPA, and (2) determining whether HUD's proposed action based on the EIS is arbitrary and capricious.

42 U.S.C. § 4332(2)(C) provides that all agencies of the federal government shall:

"(C) include in every recommendation or report on proposals for legislation and other major Federal Actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitment of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, [United States Code], and shall accompany the proposal through the existing agency review processes."

■ The undisputed record demonstrates that in preparing its final EIS, HUD gave numerous governmental agencies and other interested parties the opportunity to comment on the environmental impact of the proposed demolition of the Plankinton mansion and on HUD's draft EIS with regard to that demolition. The draft EIS as revised by the final EIS closely examines the long and short term impact of the proposed action on such factors as land use, noise, air quality, parking, and historical interests. In preparing its EIS and making a recommendation based on the EIS, HUD clearly recognized and weighed the adverse impact that demolition of the building would have in terms of historical interests:

"The long term impact is the elimination of a structure listed on the National Register of Historic Places and which is one of the last remaining vestiges of the old 'Grand Avenue' area.

"The RACM intends to demolish the Plankinton House and North Wing Addition while preserving items of important

historic and architectural value for display in other public buildings. This would mitigate some of the long term impacts of demolition by providing for a permanent record of the building and allow for public interpretation and commemoration of the resource." § 4.120 Final EIS.

■ In its EIS, HUD also considered the entire range of alternative actions it could take, those being: (1) no federal action, (2) approving the federal financing of the demolition without modification, (3) approving the federal financing of the demolition only after documentation of the mansion's interior and exterior had taken place and after those fixtures and attachments of the structure having special historical, cultural or artistic significance had been detached and preserved for reinstallation elsewhere, (4) on site adaptive reuse of the mansion, and (5) relocation and adaptive reuse of the mansion. HUD's consideration of these factors in its draft and final EIS sufficiently meets its obligation under NEPA to consider "alternatives to the proposed action." 42 U.S.C. ¶ 4332(2)(C)(iii).

■ Contrary to the claim of the plaintiff, HUD's consideration of on site adaptive reuse of the mansion by a party other than Marquette was not insufficient in light of the information available to HUD at the time it prepared the EIS. In *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978), the Supreme Court admonished courts reviewing an agency's preparation of an EIS to judge the agency's performance in light of the information available to the agency at the time it prepared the EIS. 435 U.S. at 553, 555, 98 S.Ct. at 1216, 1217. The Court also warned lower courts not to require detailed discussions of alternative actions which "are deemed only remote and speculative possibilities, in view of basic changes required in statutes and policies of other agencies—making them available, if at all, only after protracted debate and litigation not meaningfully compatible with the time-frame of the needs to which the underlying proposal is addressed." 435 U.S. at 551, 98 S.Ct. at 1215, quoting *Natural Resources Defense Council v. Morton*, 458 F.2d 827, 837–38 (D.C.Cir.1972).

At the time HUD prepared its EIS, as is the case at the present time, Marquette University owned the land on which the Elizabeth Plankinton mansion is located. Accordingly, the only ways the building could be used on its present site by a party other than Marquette would be for Marquette to consent to such use, or for the city of Milwaukee to exercise its power of condemnation over the land. Since the land in question is a part of a land parcel designated by Marquette for future development, Marquette was not and is not disposed to selling the land to another party. At the time of the preparation of the EIS (as it is today), the possibility of condemnation of the land in question by the city was totally speculative and subject to the winds of Milwaukee city politics. A preliminary condemnation resolution was proposed in the Milwaukee common council in October of 1978. The proposal was held in committee for over a year and was still in committee when HUD prepared its EIS.

Under these circumstances, I find that HUD's consideration of alternative actions, including adaptive reuse of the mansion on its present site by a party other than Marquette, to have been sufficient to meet the requirements of NEPA.

■ I also find that the action proposed by the final EIS is neither arbitrary nor capricious. The proposal called for HUD to render no financial assistance to the demolition project for six months during which time interested parties could attempt to secure financing for relocation of the mansion. The EIS also proposed that if such financing was not forthcoming that HUD honor its commitment to finance the demolition only after documentation and preservation of significant fixtures and attachments had taken place. This proposal balanced a number of factors including (1) the historical significance of the mansion, (2) the physical deterioration the mansion was suffering from in its current state of limbo, (3) the efforts being made at the time to secure financing for relocation, (4) Mar-

quette's interest in developing its campus, (5) the fact that but for the injunction formerly pending in this case Marquette and RAM without federal assistance could legally tear down the mansion at any time. It is not this court's function to determine whether the proposed action contained in HUD's EIS was or is "the right" action. I need only determine whether HUD abused its discretion or acted arbitrarily and capriciously. Since I find HUD's proposal to fall within the range of reasonable alternatives, the plaintiff is not entitled to any further relief under NEPA, and its four causes of action under that statute should now be dismissed.

In its only other cause of action, the plaintiff alleges that HUD and RAM violated the provisions of the National Historical Preservation Act, Executive Order 11593 and regulation promulgated by the Advisory Council on Historical Preservation. For reasons stated in my decision of November 17, 1978, 460 F.Supp. at 1123–25, I find that these provisions are inapplicable to HUD's funding contract in this case. Even if I were to find the said provisions applicable in the case at bar, based on those portions of the record which are undisputed, I would also find that the plaintiff was not entitled to any further relief under those provisions.

Section 106 of the NHPA, 16 U.S.C. § 470f provides:

"The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, as the case may be, take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under [title 11 of this Act] a reasonable opportunity to comment with regard to such undertaking."

The record in this case clearly demonstrates that HUD in its EIS did "take into account" the effect of the expenditure of federal funds on the Plankinton mansion. Furthermore, the Advisory Council on Historic Preservation has been given "a reasonable opportunity to comment" with regard to HUD's proposed expenditure. The council received a copy of HUD's draft EIS and was asked to comment on it. The council submitted its comments to HUD in a letter dated February 26, 1979. The council's letter was included in the final EIS and HUD responded directly to those comments in the EIS. Page 18 final EIS. The council's letter to HUD also indicates that the council participated at a meeting held on December 21, 1978, at HUD's Milwaukee area office at which alternatives to the demolition of the building were discussed. Thus, the statutory mandate of the NHPA was clearly followed in this case.

As for the Advisory Council's regulations, 36 C.F.R. § 800.4(d) provides that when an agency determines that one of its projects may have an adverse effect on the historical or architectural characteristics of a property covered by the regulations, the agency must: (1) request the comments of the council, (2) notify the state historic preservation officer, and (3) proceed with a consultation process involving the agency, the council and the state historic preservation officer. The agency is not bound to follow the dictates of the council but "shall take [the council's] comments into account in reaching a final decision in regard to the proposed undertaking." 36 C.F.R. § 800.-6(d)(7).

The record in this case demonstrates that HUD requested comments regarding the mansion's demolition from both the council and Wisconsin's state historic preservation officer. The record is unclear as to whether the consultation process set out by 36 C.F.R. 800.6(b) was followed in its entirety.

However, even if HUD failed to comply with the letter of this process, no further equitable relief would be justified. HUD considered the positions of the council and the state historic preservation officer as

well as the alternatives to demolition. In making a recommendation of action in the final EIS, HUD was mindful of the adverse impact that demolition would have on the mansion. Accordingly, no purpose would be served by allowing the council to comment further about the available alternatives to and the adverse impact of HUD's proposed action. Under these circumstances, the plaintiff is not entitled to any further equitable relief under the NHPA or the council's regulations, and its claim under these provisions will be dismissed. *See D.C. Federation of Civic Associations v. Adams*, 571 F.2d 1310, 1313–14 (4th Cir. 1978); *Cobble Hill Ass'n v. Adams*, 470 F.Supp. 1077, 1090 n.9 (E.D.N.Y.1979).

## IV. CONCLUSION

This case arises in the context of a question which commonly arises in modern urban centers: how to reconcile the preservation of historical buildings on one hand with urban renewal on the other hand. This court is authorized to play only a limited role in the attempt to answer this question in the instant case. Marquette and RAM, the owners of the land and building in question, have the right to tear down the mansion if they so choose, and that decision would be beyond the scrutiny of this court. Even if HUD-approved federal funds are used in the demolition, this court's role is restricted to ensuring that HUD has considered the environmental impact of such funding and alternatives to demolition. These steps having been taken by HUD, this court's role in this matter must end.

Therefore, IT IS ORDERED that the plaintiff's motion for leave to file supplemental pleadings be and hereby is denied.

IT IS ALSO ORDERED that the motion of Marquette University for summary judgment be and hereby is granted.

IT IS FURTHER ORDERED that this action be and hereby is dismissed with all parties to bear their own costs.