SIERRA CLUB and Natural Resources Defense Council, Inc., Plaintiffs,

v.

John S. HASSELL, Jr. et al., Defendants,

Dauphin Island Property Owners Association, Intervenor–Defendant.

Civ. A. No. 80–0179–H.

United States District Court, S. D. Alabama, S. D.

July 21, 1980.

554

Larry T. Menefee and Gregory B. Stein, Mobile, Ala., Rick Middleton, Sierra Club Legal Defense Fund, Inc., Washington, D. C., Sarah Chasis, National Resources Defense Council, Inc., New York City, Lee L. Bishop, Natural Resources Defense Council, Washington, D. C., for plaintiffs.

Larry U. Sims, Champ Lyons Jr., and James B. Newman, Mobile, Ala., for Dauphin Island Property Owners Ass'n, intervenor–defendant and for defendants, Governor Fob James, Rex K. Rainer, Director, State Highway Dept. of the State of Alabama.

William A. Kimbrough, Jr., U. S. Atty., Mobile, Ala., James E. Brookshire, U. S. Dept. of Justice, Cleveland Thornton, Washington, D. C., for John S. Hassell, Jr., Acting Administrator, B. H. Boydston, Acting Division Administrator, Alabama Div., Federal Highway Administration, John B. Hayes, Commandant, U. S. Coast Guard, Neil Goldschmidt, Secretary, Dept. of Transp., Clifford Alexander, Secretary of Army, and Robert H. Ryan, Dist. Engineer, Mobile Dist., U. S. Army Corps of Engineers.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAND, District Judge.

### Preliminary Statement

This matter is before the Court after a full evidentiary hearing on the merits. By motion of plaintiffs, both in writing and renewed in open court, and by agreement of all defendants, the hearing on the preliminary injunction was consolidated with a hearing on the merits, pursuant to Rule 65(a)(2), Federal Rules of Civil Procedure. At the hearing, the administrative records of both the federal defendants as well as the State of Alabama defendants, all the depositions and exhibits thereto, save one (deposition of Chasis) taken in this case, and several affidavits were introduced into evidence without objection and by express agreement of all parties. In addition, the

Court heard almost three days of testimony of witnesses called by plaintiffs, together with certain documentary evidence introduced by plaintiffs and the various defendants as well as a witness on behalf of the Dauphin Island Property Owners Association.

The Court, having considered the pleadings and evidence, including the respective administrative records, depositions, exhibits and affidavits introduced by the parties, together with the applicable law, finds as follows:

## FINDINGS OF FACT

### As To This Proceeding

1. This action was commenced by Complaint filed on March 24, 1980, by the Sierra Club, Inc., and the Natural Resources Defense Council, Inc., non–profit membership corporations, on behalf of themselves, against John S. Hassell, Jr., B. H. Boydston, John B. Hayes, Neil Goldschmidt, Clifford Alexander, Robert H. Ryan, Fob James and Rex K. Rainer. The motion of the Dauphin Island Property Owners Association (DI-POA) to intervene as a party defendant was granted April 2, 1980.

### As To The Hurricane

2. On the night of September 12, 1979, Hurricane Frederic struck the Alabama coast and completely destroyed the Dauphin Island Bridge. After the hurricane, the President of the United States personally inspected the area, including the remains of the Dauphin Island Bridge, and indicated that the bridge should be replaced. (Fed.R. at 80 and 140) (Hodges at 32).

3. On September 13, 1979, the Governor of Alabama requested that the area be declared a major disaster area and the President made such a declaration. (Fed.R. at 15, 1038–1039). The declaration was confirmed by letter from the Federal Highway Administration (hereinafter "FHWA") to the Governor on September 13, 1979. (Fed.R. at 14.) The Alabama State Highway Department made a formal request for federal aid to restore damaged roads and bridges throughout the destroyed area as required by 23 U.S.C. § 125(b). (Fed.R. at 19).

### As To The Decision–Making Process

4. On September 15, 1979, personnel from the Montgomery, Alabama, divisional office of FHWA assessed the damage in the Mobile area. (R. at 7) (Campbell at 15). Several meetings were held among Coast Guard, FHWA, Corps of Engineers, and State Officials, and other governmental and public agencies immediately after the hurricane in order to coordinate the relief efforts. (Campbell at 15–16) (Hodges at 9–11) (Fed.R. at 1290–1293).

5. With regard to FHWA environmental regulations, on November 29, 1978, the Council on Environmental Quality issued regulations (40 C.F.R. Part 1500–1508) for implementing the procedural provisions of NEPA. Section 1506.12 of said regulation states that "The effective date of these regulations is July 30, 1979, except for agencies that administer programs that qualify under Sec. 102(2)(D) (42 U.S.C. § 4332(2)(D) of the Act ... an additional four months shall be allowed for the State or local agencies to adopt their implementing procedures.

6. The Department of Transportation issued guidelines contained in DOT Order 5610.1C entitled "Procedures for Considering Environmental Impacts; Policies and Procedures" on September 18, 1979 (44 FR 56420 et seq. October 1, 1979). Notwithstanding the issuance of this Order, FHWA and the Coast Guard have and are exercising independent (delegated) authority to develop and implement their own regulations which will incorporate the substantive points of the DOT Order as well as CEQ regulations. See, DOT Order 5610.1C, paragraph 20 (September 18, 1979); 44 FR 59306 (October 15, 1979, Coast Guard); 44 FR 59434 (October 15, 1979, FHWA). As of November 30, 1979, the CEQ regulations and the DOT Order were fully applicable to Federal defendant activities, (40 C.F.R. 1506.12; DOT Order, paragraph 18) but the challenged decisions had already been made under the regulations then in force.

7. An interagency committee consisting of Environmental Protection Agency, National Marine Fisheries, Department of Interior, Alabama Water Improvement Commission, Alabama Department of Conservation and the Alabama Coastal Area Board was established to advise the Coast Guard, Federal Highway Administration (FHWA), Corps of Engineers (Corps), State Highway Department (State), and Federal Emergency Management Administration (FEMA) on environmental matters. (Campbell at 56–57) (R. at 1290–1293). Meetings were held in Mobile on September 18, 19, 20, 21, 24, 25, 26. and 27. (Campbell at 15–16).

8. The administrative records offered by the state defendants and the federal defendants contain voluminous documentation of a cooperative effort on the part of various state and federal agencies in assessing the damage to the destroyed Dauphin Island Bridge, in considering options available for reconstruction, such as providing for a ferry service, and in considering other alternative transportation as well as information relevant to the design for a replacement bridge.

9. Intense activity is discernable between the period of the time of the hurricane and October 4, 1979, the date upon which the State of Alabama obtained the concurrence of the FHWA in the decision that the reconstruction of the bridge would be treated as non–major federal action. (Fed.R. at 31).

10. The decision to rebuild the Dauphin Island Bridge was made concurrently with the decision not to construct a permanent ferry service to Dauphin Island. The pertinent documents surrounding that decision include the handwritten notes of Captain R. C. Hodges of the United States Coast Guard, an extensive memorandum of J. R. Campbell (Fed.R. 1561–1564), ferry calculations of J. R. Campbell (Fed.R. 1992), as well as memorandum to the file of Paul G. Stough, Coordinator, Environmental Technical Section, State of Alabama Highway Department, dated April 11, 1980, reflecting actions taken prior to October 4, 1979. (St.R. Vol. II, April 11, 1980).

11. From these documents and from the depositions of Hodges and Campbell, it is apparent that several alternatives were in fact considered. These alternatives included taking no action at all, (the "no–build" option), providing air service, providing ferry service, as well as replacing the bridge, including the type of bridge. Campbell at 61–62. The no–build option was considered and rejected because of a two–lane bridge had existed for over a quarter of a century and there were some five hundred permanent families living on Dauphin Island whose lives would be severely disrupted and injured if the bridge was not rebuilt, as well as 700–800 other families with residences on the island. There were other facilities on the island including military and educational institutions and fishing industries that would suffer if the bridge was not built and no other means of transportation was provided. Campbell at 62–63. Hodges at 23. Implementing the no–build option would have significantly altered the status quo. Campbell at 63. Hodges at 46. Fed.R. at 26 and 543.

12. Air service was considered and rejected primarily because it was costly, available only to those who could afford it, unsafe and undependable due to the weather conditions, and energy inefficient. Campbell at 64. There was also the problem of obtaining emergency ferry services, as allowed in 23 U.S.C. § 125(b). Campbell at 65. Hodges at 23. Fed.R. at 1571.

### As To The Ferry Alternative

13. The ferry alternative was evaluated prior to the October 4, 1979, non–major action determination and rejected on environmental, economic and safety grounds. Hodges at 23–25. Campbell at 64, 65, 80.

14. As to environmental concerns, the agencies determined that a reasonably short route would require the dredging of a two hundred to three hundred foot wide channel through oyster beds and shrimp habitat. Campbell at 88. The channel would have to be maintained on a continuous basis because of silting in the Mississippi Sound, and the spoil materials so obtained would be

difficult to dispose of since they are unsuitable for fishing reefs or for oyster beds. Campbell at 87–88, Ryan at 43. Further, environmental degradation would occur with the dredging that would be necessary in wetland areas at both the Dauphin Island and the mainland ends of the ferry service route in order to construct necessary ferry wharfs and loading facilities. Hodges at 23–24, Campbell at 88.

15. With reference to safety, the federal and state defendants concluded that ferry service would pose a serious safety hazard to those on board since it would run perpendicular to the intercoastel waterway. Hodges at 15. Very heavy traffic, including refined petroleum products and gasoline, moves from Louisiana and Texas oil fields to the eastern coast of the United States. Hodges at 15. Furthermore, the frequent fog and storm conditions on the waterway coupled with the absence of access to hospital facilities for residents of the island and disaster evacuation limitations, made a ferry system an unsafe alternative. Campbell at 69, Hodges at 24.

16. With reference to economic considerations, the record reflects that prior to the decision to reconstruct the Dauphin Island Bridge the FHWA had calculated the cost of a ferry alternative based on available figures concerning the cost of emergency ferry service. Fed.R. 1992. These costs were calculated for the first year of operations to be 48.4 million dollars, including capital and operating deficit. There is an additional cost of 12.6 million for increased dredging, not part of the 48.4 million dollars. These calculations were based on the assumption that at least two 200 vehicle ferries would be needed although this system would not have provided adequate service even at current traffic demands. Campbell at 75, 76. The cost projections for a ferry substantially exceeded the estimated costs of bridge reconstruction.

17. The subsequent data concerning the option of a ferry boat alternative, as reflected by the affidavit of Dr. Heathington and the computation of J. R. Campbell in light of a study of ferry services in the State of Washington, confirms the wisdom of the initial determination, made in the wake of the storm, that a ferry boat system was not a reasonable alternative.

*As To The Reconstruction Of The Bridge*

18. As pointed out in the Campbell memorandum of October 4, 1979, the state's first plan was to construct a new bridge on an alignment several hundred feet to the west of the old structure. Fed.R. at 1561–1564. However, early contacts with agencies involved in obtaining dredging permits indicated strong objections because of what was described as prime oyster beds in that vicinity. Fed.R. at 1561. For this reason, an alignment following that of the destroyed structure was selected and the work channel on the east side was approved since it would have the least, if any, environmental impact on oyster beds. Fed.R. at 1561.

19. Federal and state defendants specifically considered the effects the bridge would have on Dauphin Island as is evidenced by the decision to replace the bridge that had been destroyed with a similar two–lane bridge. Federal defendants considered traffic studies and the fact that use of the old bridge had never approached its full capacity. St.R. Vol. II, following May 7, 1980. The federal and state defendants concluded that the projected traffic flows were the same whether the old bridge remained in place or whether the replacement bridge is completed. Campbell at 49–55, 136–137.

20. The federal defendants determined that no significant alteration to the human environment would occur from rebuilding the two–lane bridge. Fed.R. at 26, 140, 543. Campbell at 55–57; 136–137, 140, 162, 165, 167 and 169. The bridge did not require any additional right–of–way, no communities were divided and no people, houses or businesses were displaced. No prime or unique farmland was involved and no public parks were to be taken. There was to be no alteration of wildlife or water fowl refuges and no historical, cultural or archaeological sites were found to be involved. The federal and state defendants concluded that

noise and air quality were not altered and that there would be no adverse water quality impacts. Finally, federal and state defendants found that there would be no adverse wetland impacts because no wetlands existed within the highway rights-of-way. Hodges at 32–45, Campbell at 187–189. Indeed, the bridge is to be reconstructed from FHWA's Emergency Relief Program (23 U.S.C. § 125) and that program is designed to repair and reconstruct disaster damage to existing highways and not to provide new capacity or encourage new development. (R. at 140–141).

21. The Federal administrative record contains a profile of Dauphin Island land use dated October 11, 1979, prepared by J. R. Campbell (Fed.R. at 475–476). This document reflected information Campbell had obtained prior to October 4, 1979. Campbell at 25–26. That information reflects that the federal and state defendants acted in cognizance of a substantially developed island containing a variety of business and residential interests with approximately 500 year round families living permanently on the island as well as substantial commercial operations and other residences. In addition, there were governmental installations, including a Coast Guard station, a federal shell fish laboratory, a state educational facility, and an office of the State of Alabama, Department of Conservation and Natural Resources, were on the island at the time of the hurricane. Fed.R. at 475.

22. Considerable saving of time was obtained by reason of the availability of the plans for the recently opened I–10 Bayway Bridge located some 25 miles to the north of Mobile Bay. The experience in the design of that bridge in this hurricane prone area dictated that the construction of the new bridge be at elevation 23 feet above mean sea level, thus making it not as susceptible to hurricane loss as the earlier structure. Furthermore, the piers on the design of the bridge are fewer and wider apart than the older bridge thus making easier the ebb and flow of water in the bay, thereby avoiding floodplain involvement, and permitting vessels traveling the intercoastal waterway to pass under the bridge more safely, avoiding

the numerous accidents that had occurred at the old bridge site.

23. The design called for covering the entire distance from Cedar Point to Dauphin Island, thus permitting recovery of the wetlands that had formerly been situated under a causeway portion of the old bridge. Campbell at 117–118.

24. Dredging in connection with the construction process was anticipated to yield a spoil of esterine clay and organic silt that was considered to have an undesirable environmental effect if disposed of in the area of oyster beds. Campbell at 33–34. The decision was made to use such material to restore land mass that had been lost at Cedar Point and Little Dauphin Island. Campbell at 35–36.

### As To The Permitting Activities

25. On October 4, 1979, the United States Army Corps of Engineers issued a permit for the dredging of a work canal and the reconstruction of the Dauphin Island Bridge after a determination had been made that such activity would have no significant effect on the environment. Fed.R. at 1290 *et seq.* Notice of this action was published on November 16, 1979. Fed.R. at 1858. That notice demonstrates coordination with the various conservation and environmental interests as well as notice to seven different groups of the Sierra Club. Fed.R. at 1948–1991.

26. The United States Coast Guard issued a public notice on October 26, 1979, of application for a permit for the Dauphin Island Bridge. That notice refers to the construction of a replacement bridge and contains the statement that the project is considered to be a categorical exclusion from the National Environmental Policy Act since it is a replacement on an existing alignment. The notice contains a provision for public comment. The record reflects that the notice was mailed to a Sierra Club group in Birmingham. See Fed.R. 1716–1743, 1730. Also, the record reflects that this notice was published in the Mobile Press Register on November 4, 1979. No

comments or objections were received. Testimony of Hodges.

27. The Coastal Area Board did not enter into its memorandum of understanding with the Coast Guard until November 14, 1979, after the issuance of the Coast Guard notice. Plaintiffs' Ex. No. 38. Prior to the memorandum and the issuance of the Coast Guard notice, the record reflects acquiescence by the Coastal Area Board in the Corps of Engineers' permit for dredging of the work canal and reconstruction of the bridge. Fed.R. at 1291, 1858.

28. The agreement of understanding between the Coast Guard and the Coastal Area Board provides that the Coastal Area Board will, within thirty days of notice, inform the Coast Guard by letter in the event additional consultation is deemed necessary by Coastal Area Board. The record reflects that no such inquiry was made by the Coastal Area Board although CAB had actual notice of the action. The record also reflects a continuous involvement of CAB with the Coast Guard and other agencies through the emergency situation existing after the hurricane and prior to and after the permitting action by the Coast Guard.

29. The Coastal Area Board also was contacted by the State of Alabama Highway Department through its environmental section head, Paul Stough, on September 26, 1979. St.R. Vol. I, at September 26, 1979, Fed.R. at 861–862.

### As To The Validity of Governmental Action

30. The Court finds that the agencies acted reasonably in their view of the ferry alternative, and the conclusion that the ferry alternative was not feasible is not arbitrary, capricious, or an abuse of discretion.

31. The Court further finds that the entire process employed by the agencies in their review of the environmental aspects of the reconstruction of the Dauphin Island Bridge was reasonable and the actions taken were not arbitrary, capricious, or an abuse of discretion. Appropriate scrutiny of environmental concerns underlies the non–major action decision of FHWA, the negative declaration of the Corps of Engineers, and the categorical exclusion decision of the Coast Guard.

32. There is no satisfactory evidence that the design of the bridge will have the effect of increasing the volume of traffic to Dauphin Island over that which would have obtained had the old bridge not been destroyed, and detailed and substantial evidence, available and used by FHWA prior to October 4, 1979, that it will not.

33. There is little evidence, and none that is satisfactory, that the construction process itself will have any effect on the environment. The dredging of the work channel was virtually an accomplished fact that by the time the plaintiffs elected to file their action. The placement of material on Little Dauphin Island will not cause environmental damage and, in fact, has a positive environmental effect by reason of it being the situs of temporary nesting grounds for coastal birds. Testimony of Campbell.

34. With reference to the prospect for future development of Dauphin Island after completion of the reconstruction project, there are several governmental agencies which have environmental responsibilities for oversight of future development activities on the island. These agencies include the U.S. Army Corps of Engineers, the State of Alabama Department of Conservation and Natural Resources, the United States Environmental Protection Agency, the United States Fish and Wildlife Service, the Alabama Historical Commission, the Alabama Water Improvement Commission, the Mobile County Board of Health, the State of Alabama Board of Health, and the Alabama Coastal Area Board. Testimony of Clark. Testimony of Stout.

35. That State of Alabama has made it illegal to operate dune buggies or other vehicles on sand dunes. Testimony of Clark and Nordquist. Mobile County and the Dauphin Island Property Owners Association impose various restrictions on land use which preclude construction on sand dunes, control size of construction, set–back re-

quirements, prevent nuisances and otherwise have the effect of a system of zoning ordinances. Testimony of Pickett. The Mobile County Board of Health has indefinitely suspended permits for septic tanks. Testimony of Pickett.

36. The views of the Federal Emergency Management Agency concerning reconstruction of the bridge was included in the record (Fed.R. at 116–118) and it contained the suggestion that in the event no reasonable alternative to the bridge was found, then the bridge construction should be at such elevation as not to be susceptible to destruction by hurricane. The design criterion of a bridge at an elevation of 23 feet above sea level satisfies the concerns of FEMA. FEMA reviewed the Coast Guard's permit application and made no objections. Hodges at 52–64.

37. The Court finds that the agencies correctly concluded that the reconstruction of the replacement bridge would have no significant environmental effects upon Dauphin Island and surrounding areas other than those that would have been presented had the former bridge not been destroyed by Hurricane Frederic.

38. Carolyn Carr, one of only nine national vice presidents of the National Sierra Club and the state conservation chairman for Alabama, is quite knowledgeable in environmental matters, having helped lobby for the passage of the National Environmental Policy Act in Congress in 1969. Carr at 9–10, 110–111. As conservation chairman, Carr was responsible for keeping track of conservation issues that are of interest to the Sierra Club and bringing same to the attention of the national organization. Carr at 9–10, 13–14.

39. Carr was familiar with the Federal Highway Administration major, non–major regulations during 1979 (Carr at 185–186). Carr knew of the loss of the bridge almost immediately after it had occurred (Carr at 66–67) and knew all along that the bridge would be rebuilt (Carr at 175–178, 72–73) but only assumed that an environmental impact statement was being prepared (Carr 88–89).

40. Carr, although having visited Dauphin Island twice in the two years prior to the hurricane, did not begin to think of the reconstruction of the bridge in terms of issues raised in this lawsuit until she read a book about barrier islands after the first of the year in 1980 (Carr at 76–77) and after she received a phone call from Frederick Middleton, counsel for the Sierra Club. Carr at 86–87. Carr recognized Dauphin Island as a barrier island when she visited the island in April, 1975, Carr at 86–87. Carr made no inquiry of any governmental agency until February of 1980. Carr at 154–157.

41. The other representatives upon whom plaintiffs rely for standing have been aware of the plans to reconstruct the bridge since the Fall of 1979 and yet made no inquiry of nor objections to any government agency. Affidavits of Anderson, the Horns and Stipulation.

42. The State of Alabama has committed approximately seven million dollars to the entire process of reconstruction of the Dauphin Island Bridge and as of the time of the trial, some $600,000 had already been paid to Brown and Root, Inc., the prime contractor for the specific portion of the work dealing with the construction of the new bridge. Another $600,000 had been billed and had not been paid as of the time of the trial. Testimony of Epsy.

## CONCLUSIONS OF LAW

43. This Court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1331.

44. Judicial oversight in actions of this nature is governed by the Administrative Procedure Act, 5 U.S.C. § 706, which limits judicial review to actions that have been shown to be arbitrary, capricious, or in the nature of an abuse of discretion. Actions involving the National Environmental Policy Act are subject to inspection more searching than a review for arbitrariness or capriciousness. *Save Our Ten Acres v. Kreger*, 472 F.2d 463 (5th Cir. 1973). That "more searching" standard is defined as a

requirement that the Court be satisfied that the agency has taken a "hard look" at environmental consequences but that authority does not give the Court the right to insert itself within the area of discretion of the executive as to the choice of the action to be taken. *Kleppe v. Sierra Club*, 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976); *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 555, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978).[1]

45. Plaintiffs have outlined three basic contentions in their brief in support of their motion for a preliminary injunction. These include the contention that there was no analysis and consideration of adverse effects, possible alternative actions, and mitigation prior to final decisions implementing actions. With respect to this contention, the foregoing Findings of Fact adequately reflect a record of analysis and consideration of adverse effects, possible alternative actions and mitigation. Plaintiffs also contend that an objective analysis of a permanent ferry system would prove its validity.

46. By way of background, the National Environmental Policy Act establishes significant substantive goals for the nation but imposes upon agencies duties that are essentially procedural and designed to insure fully informed well considered decisions, but not necessarily a decision that a judge would have reached had he been a member of the decision making unit. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978).

47. An agency, in selecting a course of action, is not bound to elevate environmental concerns over other appropriate considerations and, once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences.

The Court cannot interject itself within the area of discretion of the executive as to the choice of action to be taken. *Strykers Bay Neighborhood Council v. Carlen*, 444 U.S. 223, 100 S.Ct. 497, 500, 62 L.Ed.2d 433, 437 (1980). The court's review is limited by the time at which the decision was made as well as the statute mandating review. *Vermont Yankee, supra*, 435 U.S. at 555, 98 S.Ct. at 1217.

48. Plaintiffs also contend that restrictive zoning or government purchase of remaining undeveloped portions of the island could be insisted upon as a condition of approval of reconstruction of the bridge. This aspect of plaintiffs' claim and, in some aspects, the entire claim of the plaintiffs to the extent that it advances plaintiffs' desires with reference to pending legislation for government purchase of barrier islands, proceeds on the assumptions that NEPA applies to actions that do not alter the status quo and that NEPA is an appropriate vehicle for the pursuit of political objectives under the guise of environmental protection litigation. Efforts to use the National Environmental Policy Act as a vehicle for furthering other causes or interests have been rejected. See *Cobble Hill Association v. Adams*, 470 F.Supp. 1077 (E.D.N.Y.1979) (political) and *Presideo Bridge Co. v. Secretary of State*, 486 F.Supp. 288 (W.D.Tex. 1978) (economic). Accordingly, plaintiffs' request that the Court embark upon a renovation of the political structure of Dauphin Island under the guise of environmental litigation is declined.

49. Turning specifically to the involvement of the Federal Highway Administration in concluding that the reconstruction of the Dauphin Island Bridge involved non–major federal action having no significant effect on the environment, the record, as the foregoing findings reflect, contains an adequate development of examination of environmental factors by the various agencies.

---

1. After the decision of the Supreme Court in *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 100 S.Ct. 497, 500, 62 L.Ed.2d 433, 438 (1980), it is questionable whether the Fifth Circuit rule in *Save Our Ten Acres v. Kreger*, 472 F.2d 463 (5th Cir. 1973), is still the appropriate standard.

50. FHWA, as an administrator of programs that make grants to states, is deemed an agency that qualifies under Section 102(2)(D) of the Act (NEPA) and the CEQ regulations so as to be entitled to the four months extension of time referred to in paragraphs 5 and 6 of the Findings of Fact with regard to applicability of the new CEQ regulations. Consequently, the CEQ regulations did not apply to FHWA until November 30, 1979.

51. Since the agency's threshold determination was made on or about October 4, 1979, the Federal defendant (FHWA) was operating under authority set forth in 23 C.F.R. Part 771, and not under the regulatory CEQ requirements. This construction is verified by both CEQ's preamble to the final regulation at 43 Fed.Reg. 55988 (November 29, 1978) and FHWA's publication of the Notice of Proposed Supplementary Guidance and Procedures on October 15, 1979 (44 FR 59436) concerning Environmental Impact and Related Procedures where, in the supplementary information section, 44 FR at 49438, the proposal states "Although, *with the notable exception of the Federal–Aid Highway Project development*, the operations of FHWA and UMTA have been directly governed by the CEQ regulations since July 30, . . .". Emphasis added.

52. In addition, Section 771.205 of the proposed FHWA regulations defines categorical exclusions, previously "non–major actions", and they are almost identical in standards to the previous regulation. The new regulation specifies that categorical exclusions "will not induce significant, *foreseeable alterations* in land use, planned growth, development patterns, traffic volumes, travel patterns, or natural or cultural resources". 44 FR at 59441 (emphasis added). The examples of a categorical exclusion, found in the appendix to the regulation, 44 FR at 59445, are substantially the same as the examples of non–major actions found in 23 C.F.R. 771.9(e), the FHWA regulations in existence as of October 4, 1979. Therefore, even if the new regulations were applicable, plaintiffs cannot show any entitlement to a different result.

53. This project, the reconstruction of the Dauphin Island Bridge, involves the repair of an existing highway through the use of emergency relief funds pursuant to 23 U.S.C. § 125. The reconstruction is a project that will not result in any long term *changes* in the environment, *alterations* in land use, planned growth or other consequences contemplated by statute and regulation, and it is not of such character to warrant NEPA statements. *Cobble Hill Association v. Adams*, 470 F.Supp. 1077 (E.D.N.Y.1979). (Fed.R. at 140–141).

54. The examples of major and non–major actions appearing in the Federal Highway Administration Program Manual, when read as a whole, justify the determination that the replacement of the Dauphin Island Bridge was a non–major federal action.

55. The application of the FHWA major, non–major action regulations are properly viewed with an eye to whether there would be an alteration of the environment. See 23 C.F.R. § 771.2(d). The criteria for major action is any action that is likely to precipitate "significant foreseeable *alterations* in land use" such as "a *new* freeway or expressway", "a highway which provides *new* access to an area . . . likely to precipitate significant *changes* in land use", "a new or reconstructed arterial highway which provides substantially *improved* access . . . likely to precipitate "significant *changes* in land use", "a *new* circumferential or belt highway which *bypasses* a community", "a highway which provides *new* access to areas containing significant amounts of exploitable natural resources", "added interchanges . . . which provide *new* or *substantially improved access* likely to precipitate significant *changes* in land use". FHPM 7–7–2, emphasis added. *Non–major* actions include, but of course are not limited to, "construction of a new rural two land (sic) highway which does *not* provide new access and which would *not* be likely to precipitate significant changes in land use", "widening less than a single lane width", "reconstruction of existing cross road or railroad separations and existing stream crossings", and "temporary replacement of

a highway facility which is commenced immediately after the occurrence of a natural disaster". FHPM 7–7–2, emphasis added.

■■ 56. From this overview, the flavor of replacement of a facility which affords no new access, with the same number of lanes, under circumstances where no significant change in land use from the use under the old bridge can be projected, comes through clearly as non–major action. As a matter of fact, the inference from the example of major action as one have to do with a circumferential highway which *bypasses* a community is clear that the *denial* of access is, in and of itself, major action. Thus, the examples of non–major action can fairly be read with a presumption that replacement of access where its elimination would bypass the affected area is appropriately non–major action.

57. These same FHWA regulations were considered in *Cobble Hill Association v. Adams*, 470 F.Supp. 1077 (E.D.N.Y.1979), where a non–major determination was found to be reasonably related to permissible objectives in a review which was searching, but necessarily narrow. At issue was a repair of a highway and the plaintiffs argued, as plaintiffs have done here, that this was no ordinary repair since it required substantial planning and entailed a lengthy period of reconstruction as well as substantial expenditures. In upholding the non–major determination the Court stated:

> The project, however, only involves the repair of an existing highway. It does not contemplate a widening of an artery or other significant changes that would result in permanent dislocations or traffic or changes in the areas' development. See *Julis v. Cedar Rapids, Iowa, supra*, [349 F.Supp. 88] in which the court upheld an agency decision that a project enlarging a city traffic artery from two to four lanes for fourteen blocks was not major and that an impact statement was thus not necessary. See also *Kisner v. Butz*, 350 F.Supp. 310 (N.D.W.Va.1972). While the repairs here are undoubtedly significant, they are not of the character to warrant a NEPA statement since they

will not result in any long–term changes in the environment, alterations in land use, planned growth or other consequences contemplated by statute and regulation. Thus, under these circumstances, the court cannot conclude that the determination that the project was not major constitutes arbitrary and capricious action, is not otherwise in accordance with law, or represents an unreasonable judgment on the part of the government officials involved in *Cobble Hill, supra* at 1086. Emphasis in original.

As to the absence of significant environmental effect, the Court concluded:

> ■■ The repair of the roadway contemplates preservations of the highway and not a departure from its present use. Although the streets through which detoured traffic will be rerouted may undergo an increase in traffic, they are currently heavily used and thus should not change radically in character. Since the effects of the repair and the consequent rerouting of traffic during the period of reconstruction will not result in radical changes in the area and are incidental to defendants' attempts to conform the project to existing uses, the findings of no significant environmental effect cannot be considered arbitrary and capricious. *Cobble Hill, supra* at 1087.

Recognition of absence of change from the status quo mandates a similar result in the instant case. Plaintiffs have relied heavily on *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975), but it is not in point because it dealt with proposed *new* access by interstate highway to rural farmlands where none had existed before.

■■ 58. The duty to prepare the environmental impact statement (EIS) normally is triggered when there is a proposal to change the status quo. *Committee for Auto Responsibility v. Solomon*, 603 F.2d 992 (D.C.Cir.1979). Action does not significantly affect the human environment unless it significantly alters the quality of the environment. 23 C.F.R. § 771.2(d). Likewise, an EIS has been considered unnecessary in other instances where the chal-

lenged action amounts to nothing more than a challenge to the status quo. See *City and County of San Francisco v. United States*, 615 F.2d 498 (9th Cir. 1980); *Westside Property Owners v. Schlesinger*, 597 F.2d 1214, 1217–18 (9th Cir. 1979). See also, *State of California v. Bergland*, 483 F.Supp. 465, 477 (E.D.Cal.1980).

59. Plaintiffs place great emphasis on development on Dauphin Island. The foregoing Findings of Fact demonstrate that the agencies involved made a complete and full assessment of the possible environmental consequences from replacement of an existing facility and this Court does not require, as a matter of law, that the Corps of Engineers or other governmental agencies must under the National Environmental Policy Act evaluate all possible future consequences of action on Dauphin Island in determining whether or not an environmental impact statement is necessary with reference to the reconstruction of a bridge. See *Save the Bay, Inc. v. U. S. Corps of Engineers*, 610 F.2d 322 (5th Cir. 1980), where it was recognized that, as a matter of law, NEPA does not require consideration of "private acts", but only major federal actions. Thus, the refusal to evaluate the contemplated construction of a plant by a third party in connection with the objection to a pipeline was upheld. This case is even stronger since, unlike the proposed plant, the island is already substantially developed by the private sector.

60. The record also contains ample evidence of compliance with the obligations under Executive Order 11988 and 11990 in that it appears that the appropriate agencies gave due consideration to the impact of construction on the floodplain area and wetlands affected by this construction process. An obligation to evaluate impact on floodplain and wetlands in more remote contexts is not required. *Save the Bay, Inc., supra*.

61. The record also contains ample evidence of an unexplained delay on the part of the plaintiffs in the commencement of this action. The notoriety surrounding the hurricane and the reconstruction of the bridge is so overwhelming that no reasonable person can adequately explain a delay of some six months from the date of the hurricane to the commencement of this action and no explanation has been forthcoming from plaintiffs. Furthermore, the record is replete with evidence of notice to the plaintiffs. The doctrine of laches is clearly applicable in environmental cases. *Environmental Defense Fund v. Alexander*, 614 F.2d 474 (5th Cir. 1980). There is no certain period of time within which a plaintiff may reasonably delay before filing suit. That reasonable period varies upon the circumstances of each case. *Clark v. Volpe*, 342 F.Supp. 1324 (E.D.La.1972).

62. A series of critical dates passed without objection. These dates include October 4, 1979, the date of FHWA concurrence in the non–major action determination; October 26, 1979, the date of the publication of the permit application by the Coast Guard; November 16, 1979, the date of announcement of the COE permit; December 31, 1979, the deadline for obtaining commitment of emergency relief funds; and January 4, 1980, the date of formal approval of FHWA.

63. The substantial expenditures already incurred by the State of Alabama as well as by the members of the private sector constitute the undue prejudice necessary to invoke the doctrine of laches. Furthermore, while members of the public are entitled to assume that public officials were acting in accordance with the law, the public officials gave notice of their courses of action and members of the public and that state based on the same knowledge available to plaintiffs, and made substantial expenditures in reliance upon the validity of the agencies' actions. However, were it not for the Court's determination that the activities of the relevant agencies were fully in accord with all applicable statutes and regulations and executive orders, the complaint of the plaintiffs would be dismissed solely on the ground of laches. But, in view of the Court's previous determinations with respect to the failure of the plaintiffs' claims on their merits, no such disposition is necessary.

It is therefore, ORDERED, ADJUDGED and DECREED that the Plaintiffs be denied all relief under their complaint. An appropriate final judgment of dismissal will be entered as a separate document in this action.